PEOPLE ex rel. GAFFEY et al. v. FOBES, Mayor, et al.

(Supreme Court, Appellate Division, Fourth Department. May 1, 1912.)

1. MUNICIPAL CORPORATIONS (§ 335*)—PAVING IMPROVEMENTS—REJECTION OF BIDS—POWER OF BOARD.

The general power conferred upon the board of contract and supply by Second-Class Cities Law (Consol. Laws 1909, c. 53) §§ 120, 121, to reject all bids for public work, applies generally and includes paving work under section 124, though the last sentence of section 124 provides that contracts shall be awarded to the lowest bidder.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 860, 861, 863; Dec. Dig. § 335.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

2. MUNICIPAL CORPORATIONS (§ 336*)—PAVING IMPROVEMENTS—CONTRACT—
AWARD.

Though a street railroad company lost its right under its franchise
to pave a portion of a street occupied by its track by failing to give no-
tice that it would do the work, the common council could waive the
default and permit the company to pave the strip at any time before the
contract for a city improvement was made, as affecting the question
whether a particular bid for a street improvement, including the railroad
strip, was the lowest bid, after diminishing the quantity of work to be
done by deducting the railroad strip, under the power reserved by the
city in the specifications for the work.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §
862; Dec. Dig. § 336.*]

McLennan, P. J., dissenting.

Appeal from Special Term, Onondaga County.

Mandamus proceeding by the People of the State of New York,
on the relation of Albert Gaffey and another, against Alan C. Fobes,
as Mayor, and others. From an order and judgment of the Special
Term awarding a peremptory writ, respondents appeal. Reversed,
and writ dismissed.

The following is the opinion at Special Term by Andrews, J.:

An alternative writ of mandamus was heretofore granted in this matter. A
proper return was made which was said to raise issues of fact, and the case
came on for trial in the usual way. At the close of the evidence, it was con-
ceded that there were no questions to be submitted to the jury, and it was
agreed that the case should be argued at Special Term and determined upon
the questions of law involved.

It appears that, after proceedings duly had, the board of contract and
supply of the city of Syracuse on July 13, 1909, published a notice that seal-
ed proposals would be received for furnishing materials and paving Mar-
cellus street in accordance with the plans and specifications on file in the
office of the city engineer. These plans and specifications showed the street,
including the tracks of the Syracuse Rapid Transit Railway Company which
ran through it, and asked for bids for various kinds of pavement as permitted
by section 124 of the Charter of Cities of the Second Class. They also con-
tained the following provisions: "(a) The board of contract and supply re-
serves the right to reject any and all bids not deemed for the interest of the
city. (b) Street Railway Rails Deducted.—The common council reserves the
right, through the commissioner of public works, to increase or diminish the
quantity of work to be done, by adding to or deducting from the work con-
templated in the railroad strip." In the estimate of the quantity of work
to be done there was an item: "Extra foundation in railroad strip, square
yards, 6,960."

On the 19th day of July bids were received, among others one from the
relator for paving the street with Jamestown block amounting to $39,328;
and one from F. J. Baker for Johnsonburg block amounting to $40,476.50.
The price bid by the relator for the item of extra foundation in the rail-
road strip amounted to $1,392. The bid of Mr. Baker for the same work was
$3,480. If this item had not been included, Mr. Baker would have been the
lowest bidder.

Under its franchise the Syracuse Rapid Transit Railway Company was
bound to pave itself, or to pay for the pavement, of this so-called railroad
strip in case the council determined to pave any street through which it ran,
and served a notice upon the company of such intention. Thereafter the
railroad company has four months in which to do the work itself; but if it
fails to commence it within that time the city may do it and charge the cost
thereof, at the contract price, to the railroad company. It seems to be con-
ceded that this four months had expired before July 13, 1909.

After the bids were received, they were tabulated as required by law. A summary statement of them was published in the official papers, and on the 5th day of August, 1909, a petition, signed by a majority of the property owners on Marcellus street owning not less than one-third of the front feet of property abutting thereon, exclusive of city property, was presented to the board of contract and supply designating block as the material to be used in paving the street.

On August 30, 1909, the relators served upon the board of contract and supply a notice and demand in writing that the contract be awarded to them. Upon the 20th day of September the council adopted an ordinance permitting the Syracuse Rapid Transit Railway Company to pave the strip on Marcellus street, and amended its franchise so as to provide that, instead of commencing the work of paving the railroad strip in said street within the 4 months that has been mentioned, it might, within 20 days, serve notice upon the city of its intention to pave the railroad strip on Marcellus street specifying the materials to be used, which shall be either vitrified brick or block of standard grade, and that the company shall commence such paving within 20 days after written notice from the commissioner of public works so to do. The ordinance further provided that the permission and consent therein contained should not be deemed an alteration of the franchise of the railroad company so as to affect any street in the city except Marcellus street.

Upon the same day the board of contract and supply adopted the following resolution: "Resolved, that all bids or proposals for the cost of paving Marcellus street in the city of Syracuse, N. Y., and now before this board for consideration, be and the same hereby are rejected because in the opinion of this board the lowest bid or proposal therefor is excessive; and it is the judgment of this board that such rejection of said bids or proposals is for the best interests of the city and of the property owners liable to assessment for the cost of such pavement. Be it further resolved, that the secretary of this board be and he hereby is directed to advertise again for new bids or proposals pursuant to law."

Upon these undisputed facts the relators ask for a peremptory writ of mandamus compelling the board of contract and supply to award the contract for paving Marcellus street to the relators under their bid.

The defendants make three answers to this demand. They say: (a) That the board of contract and supply had the right, under the charter, to pass the resolution rejecting all bids. (b) That the relators were not the lowest bidders. (c) That mandamus is not the proper remedy.

(a) Article 8 of Charters of Cities of the Second Class deals with the department of contract and supply. Section 120 provides that it shall be the duty of the board to let to the lowest bidder, who shall give adequate security, all contracts for the performance of work for or the supply of material to the city. The board, however, shall have the power to reject all bids or proposals if, in its opinion, the lowest bid or proposal is excessive. Section 121 regulates the form of such proposals and the manner in which they shall be opened. Again it is provided that the board may reject them all and readvertise. Section 122 relates to contracts for lighting. Section 123 relates to the secretary of the board. Section 124 is in regard to contracts for paving. It provides that the council shall adopt the materials to be used for the paving of the public streets. Thereupon the city engineer is to prepare standard specifications for the performance of the work with each kind of material so prescribed. Whenever the common council shall determine to pave any street, and the preliminary proceedings have been taken, the board of contract and supply is to advertise for proposals for doing the work involved in such improvement, and specifications shall be prepared for doing it with each kind of paving material previously prescribed by the council. When more than one kind of material is prescribed, the secretary of the board shall, within a week after the proposals have been received and opened, publish for four days a summary statement of all such proposals. Thereupon a majority of the property owners abutting on said street owning not less than one-third of the feet frontage may present to the board a petition designating the general kind of pavement or material to be used. If they do not, the council shall make such designation, "and the contract for such improvement

shall be awarded for the kind of pavement or material so designated by the property owners or common council as aforesaid, and to the lowest bidder for doing the work with the kind of pavement or material so designated."

The defendants claim that notwithstanding specifications have been prepared and proposals invited, bids received and opened, a notice containing a summary of them published and a majority of the property owners owning at least one-third feet frontage have thereafter, in view of these bids, designated the particular kind of pavement, the board of contract and supply still retains the power to reject all bids or proposals if, in its opinion, the lowest bid or proposal is excessive, and may do so at any time before the contract is actually awarded by them. It is said that they have done so in this case by virtue of the resolution passed by them in September.

I do not think that this is the meaning of the statute where paving contracts are concerned. It may well be that after the bids are opened, and before anything further is done, they may all be rejected. But after a summary statement of their contents is published, and after, in view of this statement, a particular kind of pavement is selected as provided by statute, either by the property owners or by the common council, the power of the board to reject bids is lost. To hold otherwise would open the door to fraud and collusion of various kinds. The statute says that, when such a selection is made, the contract shall be awarded for the kind of pavement designated to the lowest bidder for doing the work with that particular kind of material. The language is clear, and, in view of the mischiefs that might otherwise result, it should be given its natural meaning and interpretation.

(b) As appears by the answer interposed to the alternative writ of mandamus herein, the relator was the lowest bidder. If there were a question about this, a writ of mandamus could not be granted; but there is none. The proposals are for paving Marcellus street with certain materials. The relator offered to do this work with one of those materials, block pavement, for $39,328. The next lowest bidder for the same kind of pavement was $40,476.50. The action of the common council, in subsequently amending the railroad company's franchise so that the railroad company might itself pave the railroad strip if it so desired, does not alter this fact.

(c) Mandamus in this case is the proper remedy. No contract relations existed between the city and the relator until the bid of the latter was accepted. The city could not be liable to damages for refusing to accept an offer even though it be the lowest regular offer made. Dillon on Municipal Corporations, § 470; Smith v. Mayor, 10 N. Y. 504. The relator, therefore, had no remedy at law.

Nor, if I am right with regard to the fact that their power of rejection had ended, did the board of contract and supply have any judicial or discretionary duty to perform. They acted purely ministerially. They were bound under the circumstances to let the contract to the relator. When such is the case, their action may be compelled by mandamus.

The relief demanded by the relator should therefore be granted, with costs.

Argued before McLENNAN, P. J., and SPRING, KRUSE, ROBSON, and FOOTE, JJ.

Walter W. Magee, of Syracuse, for appellants.
F. H. Collins, of Syracuse, for respondents.

FOOTE, J. [1] Defendants are the mayor and other subordinate public officers of the city of Syracuse. As such they constitute the board of contract and supply. As such board they received bids on July 19, 1909, for paving Marcellus street; the common council by ordinance having determined that a new pavement should be laid in that street. Relators submitted a bid, as did a number of others, and claim to have been the lowest bidders, and hence entitled to have the contract awarded to them. This claim has been sustained by the court at Special Term.

The material facts out of which the controversy arises are not in dispute.

The Syracuse Rapid Transit Railway Company has its tracks laid in Marcellus street. By section 98 of the Railroad Law (Laws 1890, c. 565, as amended by Laws 1892, c. 676), it is required to "pave and keep in permanent repair that portion of said street * * * between its tracks, the rails of its tracks and two feet in width outside its tracks." Under this section it has been held that a street surface railroad company is required to pay for its portion of the cost of a new pavement when required by the municipal authorities. City of Rochester v. Rochester Ry. Co., 182 N. Y. 99, 74 N. E. 953, 70 L. R. A. 773.

By the franchise granted by the city of Syracuse to the Syracuse Rapid Transit Railway Company, provision is made to the effect that, when the common council determine to pave any street upon which the railway company's tracks are laid, it shall cause to be served upon the railway company a certified copy of the resolution ordering such pavement, and at any time before the expiration of four months from such service, the railway company may commence the work of paving the railroad strip according to the plans and specifications, upon giving to the city 20 days' previous notice in writing of its intention to commence such work, and in case the railway company fails to serve such notice or to commence the work of paving the railroad strip within four months, it shall thereby lose its right to pave said railroad strip, and the city may then proceed to pave the same and to charge the cost thereof "at the contract price for the balance of the street" to the railway company and collect the same from the company.

The city served the railway company with proper notice, and the railway company allowed four months to expire without beginning the work of paving the railroad strip or serving notice of its intention so to do. This occurred before the bids had been received on July 19, 1909. By the specifications for the pavement an extra foundation was provided for in the railroad strip, amounting to 6,960 square yards in excess of the regular foundation such as was provided for the rest of the street, and the bidders were required to specify, and did specify, the amount of their bids, respectively, for this extra foundation in the railroad strip. Relators' bid for this extra foundation was $1,392. The bid of F. J. Baker, whose total bid was next higher than relators, was for this extra foundation $3,480. The specifications for the pavement contained this clause:

"The common council reserves the right through the commissioner of public works to increase or diminish the quantity of work to be done by adding to and deducting from the work contemplated in the railroad strip."

Also a clause under "Notice to Contractors," as follows:

"The board of contract and supply reserves the right to reject any and all bids not deemed for the interest of the city."

In accordance with the provisions of the charter of the city, bids were invited and received for each kind of pavement authorized to be used in that city. The charter provided that, where the expense of the pavement is to be assessed upon the abutting property, the prop-

erty owners to be assessed may by petition determine the kind of pavement to be laid in the street, after the bids upon the several kinds have been received, tabulated, and published. The bids were tabulated and published shortly after July 19, 1909, and in due time the property owners by the requisite petition selected brick block pavement as the kind to be laid, for which variety of pavement nine bids had been received; that of relators' for the total sum of $38,338 for the whole pavement, including the railroad strip and its extra foundation, being the lowest. The next highest bid was by F. J. Baker, a total of $40,476.50, including the whole pavement and the extra foundation in the railroad strip. But relators' bid for the pavement proper, not including the extra foundation in the railroad strip, was at the rate of $2.05 per square yard, while that of Baker for the pavement proper was only $2 per square yard. It was therefore relators' bid of $1,392 for the extra foundation, as against Baker's bid for the same of $3,-480, which made relators' total bid for the whole work the lowest. No action having been taken to award the contract, relators, on August 30, 1909, served a written notice on the board demanding that the contract be awarded to them. No action was taken, however, by the board until September 20, 1909. In the meantime and on September 7, 1909, the Syracuse Rapid Transit Railway Company presented a petition to the common council asking to be permitted to itself pave the railroad strip. This petition was granted by the common council on September 20th, and formal ordinance adopted giving permission and consent to the railway company for it to pave the railroad strip and amending the company's franchise accordingly. On the same day, the board of contract and supply adopted a resolution rejecting all bids received for this pavement on the ground, as stated in their resolution:

"That in the opinion of this board, the lowest bid or proposal therefor is excessive, and it is the judgment of this board that such rejection of said bids or proposals is for the best interests of the city and of the property owners liable for assessment for the cost of said pavement."

Said board also adopted a resolution directing its secretary to advertise again for new bids or proposals pursuant to law.

The motion papers in this proceeding had, however, been served on September 13th; the notice of motion being for a Special Term to be held on September 25th.

The Special Term has held that after the bids had been received, opened, tabulated, and published, and the property owners had selected the kind of pavement to be laid in view of the bids received, the power of the board of contract and supply to reject all bids is gone, and the lowest bidder for the particular kind of pavement selected by the property owners has a legal right to have the contract awarded to him. It was also held that relators made the lowest bid for brick block pavement and that mandamus was their proper remedy.

These questions turn upon the interpretation to be given to sections 120, 121, and 124 of the Second-Class Cities Law, being chapter 53

of the Consolidated Laws. Section 120, after specifying what city officers shall compose the board of contract and supply, provides:

"Except as otherwise provided by law, it shall be the duty of such board, after public notice and in accordance with regulations to be prescribed by general ordinance of the common council, to let to the lowest bidder, who will give adequate security therefor, all contracts for the performance of any work or for the supply of any material required by or for the use of any officer, board, body or department of the city, in all cases where the expense of such work or materials, or both, shall exceed the sum of two hundred and fifty dollars (except in certain emergencies not material here). * * * The board shall have power to reject all bids or proposals if in its opinion the lowest bid or proposal is excessive."

Section 121 prescribes the methods to be pursued in receiving and opening bids for public work of the city, including the time, place, and manner of opening bids, and also provides as follows:

"The board may reject all bids or proposals received at any meeting and advertise again for new bids or proposals to be received at another meeting as above prescribed."

Section 124 provides:

"The common council shall, by general ordinance, prescribe, approve and adopt the materials to be used in paving * * * the streets and public places of the city, and fix the standard of excellence and test required for each such material. The city engineer shall prepare standard specifications, in accordance with such ordinance, for the performance of the work involved in such improvements with each kind of material so prescribed, approved and adopted therefor. Whenever the common council shall determine to make any such improvement, and the proceedings provided by law as preliminary thereto shall have been taken, the board of contract and supply shall advertise for proposals for the furnishing of the materials and the performance of the work involved in such improvements, and specifications shall be prepared and proposals shall be invited, pursuant to the provisions of this chapter, for the construction of such improvement *with each kind of paving material* so prescribed, approved and adopted by the common council. In case the expense of such improvement is to be assessed upon the property abutting upon the street, * * * the secretary of the board shall, within one week after proposals for such work have been received and opened, cause to be published in a daily official paper for four successive days * * * a notice containing a summary statement of all such proposals. A majority of said property owners * * * may present to the board of contract and supply a petition or other writing designating the general kind of pavement or material to be used in making said improvement. If no part of the expense of such improvement is to be assessed upon the property abutting upon said street, or if such expense is to be so assessed, but the property owners shall not have made a designation * * * the common council shall, not later than at its next regular meeting after the expiration of ten days from the service of such notice, designate the kind of pavement or material to be used in making such improvement, *and the contract for such improvement shall be awarded for the kind of pavement or material so designated by the property owners or common council as aforesaid, and to the lowest bidder for doing the work with the kind of pavement or material so designated.*"

The last sentence above quoted was held by the trial court to be mandatory upon the board of contract and supply and to deprive that board of the power given in the previous sections to reject all bids and readvertise, and of the right so to do contained in the specifications for this particular pavement. This construction was adopted for the reason that, as section 124 relates exclusively to paving contracts and contains no special provision for rejecting all bids and readvertising,

135 N.Y.S.—48

the provisions of sections 120 and 121 on that subject do not apply to paving contracts, or, at all events, were not intended to apply after the result of the bidding had been published and the property owners had proceeded to select the particular kind of pavement to be laid. This construction was reached on the ground that to hold otherwise would open the door to fraud and collusion of various kinds.

We are unable to concur in this view. There seems to be no sound reason for making a different rule in reference to paving contracts than for any other public city work, and we do not think such a distinction is made or intended by this section. It seems reasonably clear that the general power conferred upon the board of contract and supply by sections 120 and 121 to reject all bids for work to be let by public bidding applies generally and is intended to include paving work as well as other work.

In the present case bids were received for six different types of pavement besides the brick block. There were nine separate bids for the brick, and from one to three for each of the other varieties. When these bids were received and tabulated, the board could not know which type of pavement the property owners would select. The bid for one type they might consider fair and reasonable, and for another type, excessive; but unless the property owners should select the type for which the bids were considered excessive, there was no occasion to reject all bids for fear of that result. The proper time for this board to exercise its discretion would seem to be after it knew the type of pavement preferred and selected by the property owners. The three sections of the statute referred to are found in article 8 of the General Statutes, which is entitled "Department of Contract and Supply." We think they should be construed together as vesting in the board the same right to reject all bids and readvertise in the case of paving contracts as of other contracts required to be let to the lowest bidder; and that the clause of section 124, which provides that the contract shall be awarded "for the kind of pavement so designated by the property owners and to the lowest bidder for the kind so designated," was not intended to, and does not, deprive the board of the power given them in the previous sections to reject all bids and readvertise at any time prior to the formal action of the board in awarding the contract. Prior to that time the bids are mere proposals.

In Walsh v. Mayor, etc., of New York, 113 N. Y. 142, 20 N. E. 825, construction was given to the provisions of the charter of the city of New York relating to public contracts, which required that all such contracts "shall be awarded to the lowest bidder for the same with adequate security, and every such contract shall be deemed confirmed in and to such lowest bidder at the time of the opening of the bids, estimates or proposals therefor, and such contract shall be forthwith duly executed  *  *  *  to such lowest bidder"; and it was held that this more definite and specific language did not prevent the public authorities from rejecting all bids and readvertising, and was not intended to have that effect.

In that case, as here, the bidders were warned in the advertisement and specifications that the right to reject all bids was reserved; but

the decision was not placed upon the legal effect of such reservation, but squarely upon the construction and legal effect of the provisions of the charter.

Moreover, provisions of this character in city charters are not made for the benefit of contractors or bidders upon public works, and are not available to them to compel the execution in their favor of such contracts by city officials. They are intended for the benefit and protection of the public, as has been recently held by the Court of Appeals in the case of Molloy v. City of New Rochelle, 198 N. Y. 402, 92 N. E. 94, 30 L. R. A. (N. S.) 126. The charter of the city of New Rochelle contained this provision:

"Whenever any expenditures to be made or incurred by the common council or city board or any city officer in behalf of the city for work to be done or materials or supplies to be furnished, * * * shall exceed two hundred dollars, the city clerk shall advertise for and receive proposals therefor, in such manner as the common council, or as the board or officer charged with making such contract shall prescribe, and the contract therefor shall be let to the lowest responsible bidder, who shall execute a bond to said city with one or more sureties, being freeholders, for the faithful performance of the contract."

The plaintiff in that case was the lowest bidder for a street pavement. Nevertheless, his bid was rejected and the contract awarded to another bidder for a larger amount. Thereupon Molloy sued the city to recover as damages the profits he would have made had this provision of the charter been complied with and the contract awarded to him. In the course of the prevailing opinion, Judge Chase reviews many authorities, and, among others, the case of East River Gaslight Co. v. Donnelly, 93 N. Y. 557, relating to a similar statute, from the opinion in which he quotes, as follows:

" 'The statute merely provides a scheme for the prudent administration of the affairs of the city, and has imposed a duty upon the defendants to carry it out. This duty appears, from the plaintiff's showing, to have been violated. But the duty is a public duty to the city or people at large, not to the plaintiff or for the benefit of individuals, or the promotion of any private interest, nor has the statute given to the plaintiff or any person any action for its violation.' "

Thereupon Judge Chase proceeds to say:

"The court used the language quoted in an action brought by the plaintiff against the defendants, who composed the common council of Long Island City, to recover against them individually the damages which he claimed to have incurred by reason of their failure to obey the statute. Such language, however, is applicable to this action in which the plaintiff seeks to make the municipality respond in damages for the failure of its officers to obey a statute enacted for the express purpose of protecting the municipality in its property rights. The statute was not enacted for the benefit of the plaintiff, and he cannot recover by reason of its provisions."

It must be equally true here, as the statute we are considering was not enacted for the benefit of relators, they can have no remedy by reason of its provisions.

Having thus disposed of the claim of the plaintiff in the Molloy Case, so far as it rested upon the statute, the opinion then proceeds to consider the alleged right asserted to recover upon the contract, and held that no contract relation arose from plaintiff's bid in that case

being the lowest bid, notwithstanding the requirement of the statute that the work should be let to the lowest bidder. The opinion then proceeds:

"The statute and the advertisement in this case calls for proposals. The common council reserved the right to reject any and all bids. Under a statute requiring that all contracts shall be awarded to the lowest bidder, the body awarding the contract acting in good faith may refuse to so award the contract if they deem it for the best interest of the city to do so, and may reject all of the bids and readvertise"—citing Walsh v. Mayor, etc., of New York, supra.

The opinion then proceeds to point out the manner in which the provisions of such statutes are enforced by the courts, when their enforcement is sought by one for whose benefit they are enacted, citing numerous cases to show: (1) That actions upon contracts let in violation of such statutes are not sustained. (2) That the petitions of contractors who have taken contracts in violation of such statutes to compel the municipal officers to pay in pursuance of such contracts are denied. (3) That assessments involving expenditures in violation of such statutes are set aside upon the petition of taxpayers. (4) Taxpayers' actions to prevent the making of contracts contrary to the statutes are maintained. All the judges concurred in this opinion, except Judge Vann, who concurred in the result.

The case is, we think, controlling against relators' claim to be awarded the paving contract in question.

[2] There is a further question as to whether relators were in fact the lowest bidders.

We think it was within the discretion of the common council to waive the default of the Syracuse Rapid Transit Railway Company and permit it to pave the railroad strip at any time before the contract was actually let to others, or at least that part of it described as the extra foundation in the railroad strip. The specifications stated:

"That the common council reserves the right through the commissioner of public works to increase or diminish the quantity of work to be done by adding to or deducting from the work contemplated in the railroad strip."

Thus, even after the contract had been let, it was competent for the common council to take away from the contractor the work of laying this extra foundation and to permit the railway company to do that work or to let it to others. If that was done before awarding the contract, bidders could not complain. The board, in view of that contingency, might well be in doubt as to whether relators were, in fact, the lowest bidders; clearly they were not, unless they were to lay the extra foundation in the railroad strip. On September 20th, before the board had acted upon the bids, the common council granted the request of the railway company permitting it to pave the railroad strip. It had the power so to do. It was then reasonably certain that the extra foundation would not be laid by the general contractor. While this perhaps would not justify awarding the contract to Baker as the lowest bidder, it did, we think, permit the board, acting in good faith, to reject all bids and readvertise, as was done.

In view of what has been said, it is unnecessary to consider the

question as to whether mandamus is the proper remedy in such a case as this.

We think the judgment and order appealed from should be reversed, and the writ dismissed, with costs to the defendants.

Judgment and order reversed, and writ dismissed, with costs of this appeal and in the Special Term. All concur, except McLENNAN, P. J., who dissents upon the opinion of ANDREWS, J., delivered at Special Term.